IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A. F., *a minor, by and through his father,* ANTONIO FULTZ, <br><br> *Plaintiff,* <br><br> v. <br><br> AMBRIDGE AREA SCHOOL DISTRICT, <br><br> *Defendant.* | Civil Action No. 2:21-cv-1051 <br><br> Hon. William S. Stickman IV |

### MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

  Plaintiff, A.F., a minor, by and through his father, Antonio Fultz, filed this action under 42 U.S.C. § 1983 on August 9, 2021, against Defendant, Ambridge Area School District ("School District"). (ECF No. 1). His First Amendment (Counts I and II), Fourteenth Amendment (Count III), and race discrimination (Count IV) claims arise out of the School District's removal of A.F., an African American freshman student with special needs, from the 2021–22 high school football team as punishment for a series of social media posts that school officials believed constituted terroristic threats. (ECF Nos. 1 and 4)

  A.F. filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction. (ECF No. 3). The Court held an evidentiary hearing on the matter on August 17, 2021. After carefully considering the evidence in light of A.F.'s claims, the Court finds that A.F. has not satisfied the requisite elements for preliminary injunctive relief. Specifically, the Court

holds that the record cannot, at this stage, support the requisite reasonable likelihood of success on the merits of his claims.[1] As such, the Court is compelled to deny A.F.'s motion.

## I. STANDARD OF REVIEW

The grant or denial of a preliminary injunction is within the sound discretion of the Court. *See Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotations omitted). The primary purpose of preliminary injunctive relief "is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotations omitted). The decision to issue a preliminary injunction is governed by the following four-factor test, by which the movant must demonstrate:

---

[1] If irreparable injury is likely to occur before a hearing on a preliminary injunction under Rule 65(a) can be held, a TRO may be available under Rule 65(b). *See* Fed. R. Civ. P. 65(b). Injunctive relief in any form is "an extraordinary remedy that should be granted in 'limited circumstances.'" *Messner v. Bunner,* No. 07–112, 2009 WL 1406986, at *2 (W.D. Pa. May 19, 2009) (quoting *AT&T v. Winback & Conserve Prog. Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994)). The standard for evaluating whether the issuance of a TRO is warranted is the same as that used for evaluating whether the issuance of a preliminary injunction is appropriate. *Id.* at *2. Here, A.F.'s Complaint was filed on August 6, 2021, and then the Motion for TRO and Preliminary Injunction was filed on August 9, 2021. (ECF Nos. 1 and 2). The Court, on August 10, 2021, set a hearing for August 17, 2021. (ECF No. 5). In so doing, the Court implicitly found that a TRO was an unnecessary form of injunctive relief—especially in light of the fact that A.F. had already been removed from the football team several weeks prior to the filing of the action. No imminent emergency was present justifying the entry of a TRO. To the extent that no formal order was stated issued as much, the Court denies the request for a TRO.

> (1) that [he is] reasonably likely to prevail eventually in the litigation and (2) that [he is] likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiff and (4) whether granting relief would serve the public interest.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (citation omitted). As noted, if the movant meets the first two "gateway factors," a court then determines whether all four factors, taken together, balance in favor of granting the relief sought. *Fulton v. City of Phila.*, 922 F.3d 140, 152 (3d Cir. 2019), *rev'd and remanded*, 141 S. Ct. 1868 (2021). In reaching its decision on the request for injunctive relief, a court sits as both the arbiter of legal disputes and trier of fact and is therefore tasked with resolving factual disputes and assessing the credibility of witness testimony. *See, e.g.*, *Hudson Glob. Res. Holdings, Inc. v. Hill*, Civ. A. No. 07-132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007) ("A court considering whether to grant a preliminary injunction may assess the credibility of witnesses testifying before it at a preliminary injunction hearing, and base its decisions on credibility determinations.").

## II. FACTUAL BACKGROUND

A.F., a rising freshman, was a member of the Ambridge Area High School football team. He participated in a Snapchat group comprised of fellow football players and coaches. Although the coaches did not officially sponsor the Snapchat group, there is no question that they were active participants along with the players and that the purpose of the group was to discuss team-related matters, such as practices, pre-season training and conditioning and similar topics.

On or about June 23, 2021, A.F. was confronted by coaches and fellow teammates about not attending conditioning practices. A.F. was unhappy about the communications. Coach Keith Olden wrote: "[s]o you mad at us for having your best at interest." (ECF No. 18-1 (Defense Exhibit 1)). A.F. replied: "Yes. Just let me do me. I don't need nobody's help." (*Id.*) Coach

Olden responded: "[n]aw that's what I don't do bro . . . I mentor and I kids for a living is more then just football bro." (*Id.*). After similar banter, the conversation took a turn for the worse when Coach Barnax wrote: "[w]e are teaching boys how to be men, and lying and making excuses ain't being a man." (*Id.*). A.F. responded: "I fight men." (*Id.*) A.F. next said that he was "crazy." Coach Barnax followed up on A.F.'s declaration that he was "crazy" by responding: "[t]hat don't scare me, I've dealt with crazier people. I work with murders robbers rapist." (*Id.*). A.F. responded: "I do home invasions."

After this back and forth continued, R.G., a teammate of A.F., began commenting. A.F. testified that he had a troubled history with R.G., that R.G. was a bully, and that R.G. had previously beat him up. R.G. wrote: "[b]ro just come to practice." (*Id.*) A.F. responded: "[R.G.] just stfu you dumb piece of shit." (*Id.*). R.G. sent a video file in response to A.F.'s messages. Because of the way in which video communications on Snapchat expire after a certain period of time, the contents of R.G.'s communication were not preserved. A.F. testified that R.G. "said he'd fight me . . . ." A.F. responded: "[b]itch fight me. I'll beat the shit outta." (*Id.*). He then said, "Ima show up to football to beat yo ass bitch." (*Id.*). Further, he wrote: "Alr keep that same energy when I'm there tomorrow." After additional (unpreserved) video messages from R.G., A.F. wrote: "I'll grab a fucking bottle and bash that shit on your face till I see your brain bitch." R.G. continued to respond by (unpreserved) video messages, to which A.F. replied (in order): "[n]ah being dead ass I send you bitch ass to the father." A.F. testified that "to the father" meant "to heaven." He wrote further "[n]ah fuck that I'll come up from hell and smash your fucking head on heaven's gate Bitch," "It ain't gib be stupid when yo ass dead," and "I sincerely wish death upon your soul." (*Id.* at 12, 15-17). At some point, A.F. posted a photo of himself

4

with what appeared to be a rifle to everyone in the group. It was later determined that the rifle was actually a bb gun.

A.F.'s messages and the photograph with him holding the bb gun were brought to the attention of the school administration by members of the coaching staff. Principal Janice Zupsic met with A.F. and his father, along with Assistant Superintendent Barry King, the head football coach and one assistant coach. (ECF No. 25, pp. 82–83). Principal Zupsic testified that she was concerned because "there was a statement made that they were going to come to football practice to have an altercation" and because it appeared "to be a weapon in one of the frames of the screen shot." (*Id*. at 84). School personnel tried "to determine whether it was a look-alike or an actual weapon." (*Id*. at 85). Until her meeting with A.F. and his father, Principal Zupsic was not aware that the weapon in the photo was a bb gun. (*Id*.). When told so by A.F. and his father, she notified the local police department so that they could investigate. (*Id*.).

In the course of her investigation, Principal Zupsic "worked with the athletic director, gathered statements from football coaches, notified the director of special education [because A.F. was a student with an IEP] and shared the information with Dr. [Joseph] Pasquerilla," the School District's Superintendent. (*Id*. at 90). She also contacted R.G.'s mother, who declined to allow R.G. to be interviewed and to participate in the school's investigation. (*Id*. at 86–88).

Ultimately, school administrators determined that A.F.'s conduct qualified as a Level IV offense under the terms of the Student Handbook. The Handbook states in pertinent part:

> **Level IV** offenses are extremely serious
>
> They include but are not limited to: serious threats on students; making terrorist [sic] threats or bomb threats; threats or physical attack on a faculty, staff member's person, property or both—in or outside of school; drug/alcohol violations; sexual harassment; serious vandalism; stealing of money/valuables; shoplifting on class trips; weapons violation; and transferring of counterfeit money; student assault Level IV violations will result in a 10 day OSS, referral to

> the school board for expulsion, and referral to the police for arrest and filing of charges.
>
> All students who have committed a Level IV violation may be excluded from attending and participating in all school activities and functions for the remainder of the school year. Committing a Level IV violation at a special function (i.e. Prom, Mistletoe, etc.) will result in being unable to attend any future special functions (even in subsequent school years).

(ECF No. 18-4, p. 16). Principal Zupsic testified that A.F.'s conduct was classified as a Level IV infraction because it involved "serious threats on students" and "terrorist threats." After considering various options for discipline, it was decided that A.F. would be excluded from the football team. Principal Zupsic communicated this decision to A.F.'s father by telephone. She also sent a letter confirming the punishment that states, in relevant part:

> This letter serves as a follow up to the phone call on June 30th, 2021. As I had shared during our phone call, the Ambridge Area School District has determined that [A.F.] will not be allowed to participate on the football team for the 2021–22 school year as a consequence for his actions on June 23, 2021. [A.F.] made repeated terroristic threats to another student that included threatening to kill him in a number of ways. [A.F.] confirmed that he did make these threats in a statement and also stated that he showed the student a gun through the social platform he was using.
> * * *
> Because of the level of severity of [A.F.'s] actions, the district removed [A.F.] from the football team. The decision was made based on the fact that [A.F.] made repeated threats on a school platform created by the football coaches to communicate with players. The district could have taken more severe action. The district takes terroristic threats very seriously and has acted within its realm of authority to remove [A.F.] from the football team. The district will be reconvening [A.F.'s] IEP Team to review his IEP and develop a safety plan. Student safety remains the utmost importance for the district and is our responsibility to ensure all students and staff are kept safe.

(ECF No. 15-3 (Plaintiff's Exhibit D)). A.F.'s father requested and received a follow-up meeting. At that meeting, he explained the alleged history of bullying from R.G. and attempted to play a recording of R.G. (ECF No. 25, p. 71). Ultimately, the School District declined to

6

reconsider its disciplinary decision, which it conveyed to A.F.'s father by a July 19, 2021 letter. (ECF No. 15-4 (Exhibit E)).

### III.     ANALYSIS

The Court is persuaded for the reasons set forth below that A.F. has not met his burden of showing that preliminary injunctive relief is warranted.

#### A. A.F. HAS NOT DEMONSTRATED A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS AS TO HIS FIRST AMENDMENT AND FOURTEENTH AMENDMENT CLAIMS (COUNTS I, II AND III).

Having carefully reviewed the evidence and evaluated the credibility of the testifying witnesses in light of the parties' claims and defenses, the Court holds that A.F. is not likely to succeed on the merits of his First Amendment claims against the School District. Demonstrating a likelihood of success on the merits for a preliminary injunction requires only that the party "prove a *prima facie* case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001) (internal citation omitted). Plaintiff has not met this standard.

A.F. contends that the Supreme Court's recent decision in *Mahanoy Area School District v. B.L.*, 141 S. Ct. 2038 (2021), controls this case and stands for the proposition that the First Amendment protected his off-campus Snapchat postings. The Court's review of *Mahanoy* does not support A.F.'s position. Rather, the Court holds that *Mahanoy* offers him no shelter.

In *Mahanoy*, a student was excluded from the varsity cheerleading team and did not get her preferred softball position. *Id.* at 2043. She took to Snapchat and posted to her friends, "[f]uck school fuck softball fuck cheer fuck everything." *Id.* The post did not identify the school and did not target a particular member. *Id.* She posted to her private group of "friends," although the message eventually made its way to coaches and other students. *Id.*

7

The student brought an action in the United States District Court for the Middle District of Pennsylvania, which held that the school violated the student's First Amendment rights when it disciplined her for her posts—which occurred off campus and on a private social media platform. The United States Court of Appeals for the Third Circuit affirmed, holding that because the social media posts occurred off-campus, the substantial disruption test established by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), applied. The Supreme Court granted certiorari to determine "whether [*Tinker*], which holds that public school officials may regulate speech that would materially and substantially disrupt the work and discipline of the school, applies to student speech that occurs off campus." *Mahanoy*, 141 S. Ct. at 2044.

The Supreme Court recognized that it is well established that, "students do not shed their constitutional rights to freedom of speech or expression even at the school house gate." *Id.* (citing *Tinker*, 393 U.S. at 506). Rather, "courts must apply the First Amendment given the special characteristics of the school environment." *Id.* at 2045 (citing *Hazlewood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)). The Court summarized its school-speech jurisprudence:

> This Court has previously outlined three specific categories of student speech that schools may regulate in certain circumstances: (1) "indecent," "lewd," or "vulgar" speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes "illegal drug use"; and (3) speech that others may reasonably perceive as "bear[ing] the imprimatur of the school," such as that appearing in a school sponsored newspaper."
>
> Finally, in *Tinker*, we said schools have a special interest in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." These special characteristics call of special leeway when schools regulate speech that occurs under its supervision.

*Id.* at 2045 (internal citations omitted).

The Supreme Court found the school district had violated the plaintiff's right to free speech. It did not, however, take the broad brush approach the Third Circuit applied, which held nearly all off-campus speech was protected and off-limits from school discipline. Instead, it held:

> Unlike the Third Circuit, we do not believe the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus. The school's regulatory interests remain significant in some off-campus circumstances. The parties' briefs, and those of *amici*, list several types of off-campus behavior that may call for school regulation. These include serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers.

*Id.* The Supreme Court recognized that, as to off-campus speech, (1) the school will rarely stand *in loco parentis* and, thus, off-campus speech "will normally fall within the zone of parental, rather than school-related, responsibility" (2) because regulation of off-campus speech would, potentially, cover all speech in a twenty-four-hour period. *Id.* at 2046. "[C]ourts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech all." *Id.* This is especially the case where the speech is political or religious in nature; and (3) schools, themselves, have "an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." *Id.*

The Supreme Court held that the student's Snapchat messages were protected by the First Amendment. The posts, "while crude, did not amount to fighting words." *Id.* Moreover, the content of her statements, if she were an adult, would have "strong protection." *Id.* The Supreme Court rejected the school's argument that, under *Tinker*, the student's communication risked serious disruption to school activity or threatened harm to the rights of others that might justify the school's action. *Mahanoy*, 141 S. Ct. at 2048.

The evidence of record shows that A.F.'s communications were markedly different from those of the student in *Mahanoy*. Her statements were, no doubt, profane. Yet, they threatened nobody, did not allude to any actual or proposed danger to anyone, and could reasonably be construed as a crudely articulated commentary on the state of her cheer and softball programs. They certainly did not, as the Supreme Court explained, constitute fighting words or otherwise cross the line set by *Tinker* regarding speech likely to disrupt the school community.

Here, A.F.'s communications were not merely profane, but they were actual threats. Much of the threatening language was directed, primarily, at one student, R.G. Rather than a generic "fuck school fuck softball fuck cheer fuck everything," A.F. threatened to "show up at practice to beat yo ass bitch," to "grab a fucking bottle and bash that shit on your face till I see your brain bitch," to "send you bitch ass to the father," and further stated, "it ain't gib be stupid when yo ass dead" and "I sincerely wish death upon your soul." These threats were followed by the posting of A.F. with a gun, which was believed at the time to be a real gun. A.F.'s communications are threats, fighting words, and the very type of communications that the Supreme Court recognized as falling outside the protective scope of the First Amendment and, conversely, within the right of a school to regulate. *Mahanoy*, 141 S. Ct. at 2045 ("The school's regulatory interests remain significant in some off-campus circumstances. The parties' briefs . . . list several types of off-campus behavior that may call for school regulation. These include serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students . . . ."). It does not matter whether these types of communications occur on-campus or off-campus. They are simply not protected by the First Amendment and fall squarely within the authority of schools to regulate and to impose appropriate discipline.

The plain language of *Mahanoy* does not lend itself to an overly broad interpretation that would abrogate earlier cases that held that direct or implicit threats of violence fall outside the protections of the First Amendment and squarely within the authority of schools to regulate. Quite simply, *Mahanoy* does not disturb the established caselaw that free speech protections do not extend to modes of expression such as obscenity, defamation and fighting words. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992) ("[O]ur society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."); *see, e.g., McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 704 (9th Cir. 2019) (per curiam) (student created a "hit list" of students and drew graphic images of violence); *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1065–1066 (9th Cir. 2013) (student spoke about committing a school shooting); *Wisniewski v. Bd. of Ed.*, 494 F.3d 34, 36 (2d Cir. 2007) (student sent a message depicting a pistol firing a bullet at his English teacher's head); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 611 (5th Cir. 2004) (student drew a picture showing his school under attack by a gasoline tanker, missile launcher, helicopter and armed individuals); *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 619 (8th Cir. 2002) (en banc) (student drafted letters expressing a desire to molest, rape and murder his ex-girlfriend).

The Court holds that A.F. has not established that he is reasonably likely to prevail on the merits of his claims under the First Amendment (Counts I and II). Rather, the nature of the communications at issue—direct and implicit threats—have long been held to fall outside the scope of the First Amendment. The Supreme Court's decision in *Mahanoy* does not disturb that

well-established principle. Preliminary injunctive relief is not warranted as to A.F.'s First Amendment claims.

In addition to his First Amendment claims, Count III of A.F.'s Complaint alleges that the "policies" in the School District's student handbook, specifically as to Level IV infractions, are "unconstitutional on their face because they are unduly vague, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." (ECF No. 1, p. 10). In A.F.'s Memorandum of Law in Support of Injunction, he argues that the Student Handbook, particularly the portion dealing with Level IV infractions, contains "vague and undefined prohibitions on speech that purport to give the School District broad power to censor off-campus student-athlete speech, without providing objective criteria to curtail the personal and subjective discretion of administrators." (ECF No. 4, p. 13).

While the Complaint pled the Fourteenth Amendment claims and the Student Handbook was introduced into evidence, A.F. did not focus on Count III at the hearing. Nevertheless, the Court reviewed the claim as pled, in light of the evidence adduced at the hearing, and holds that it cannot give rise to preliminary injunctive relief for reasons interrelated with A.F.'s First Amendment claims. He is not likely to succeed on the merits of his Fourteenth Amendment claim that the definition of a Level IV infraction in the Student Handbook is vague and risks censoring protected speech. The speech at issue in this case is not hypothetical speech but a series of actual communications that have been introduced into evidence and discussed at length. They are direct and implicit threats that fall outside the scope of speech protected by the First Amendment according to long-established jurisprudence. The Court need not look to protected speech that *might* be punished by the Student Handbook when the actual speech in this case was simply not protected and subject to the authority of the school to impose discipline. Because

A.F. is not likely to succeed on the merits of Count III, the Court will not grant preliminary injunctive relief.

### B. A.F. HAS NOT DEMONSTRATED A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS AS TO COUNT IV.

A.F. has also failed to meet his burden to show a likelihood of success on the merits of his claim against the School District at Count IV. Count IV pleads discrimination based on race and violation of the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, and Title IV[2] and VI of the Civil Rights Act of 1964.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It protects against, among other things, the selective enforcement of a statute or policy where such enforcement decisions are based on an unjustifiable standard, such as race. *Whren v. United States*, 517 U.S. 806, 813 (1996). To state a claim for a violation of the Equal Protection Clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983, a plaintiff must establish: (1) the existence of purposeful discrimination and (2) the defendant's personal involvement in this discrimination. *See Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citation omitted). The plaintiff must show that any disparate treatment was based upon his membership in a protected class (race, gender, etc.). Personal involvement exists where the defendant engaged in the purposeful discriminatory conduct himself or knowingly acquiesced to it.

Section 601 of Title VI of the Civil Rights Act provides: "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

---

[2] The Court believes the Title IV claim is a typographical error as A.F. has not pled or presented any facts relating to discrimination on the basis of religion.

Federal financial assistance." 42 U.S.C. § 2000d. It prohibits discrimination on the basis of race, color, and national origin. To state a claim under Title VI, a plaintiff must show: 1) that there is racial or national origin discrimination and 2) the entity engaging in discrimination is receiving federal financial assistance. *See Ke v. Drexel Univ.*, No. 11-6708, 2015 WL 5316492, at *12 (E.D. Pa. Sept. 4, 2015).

As to the first element, to establish a prima facie case of discrimination in an educational setting, a plaintiff must show: (1) they are members of a protected class; (2) they suffered an adverse action at the hands of the defendants in pursuit of their education; (3) they are qualified to continue the pursuit of their education; and (4) they were treated differently from similarly situated students who are not members of a protected class. *See id.* After a plaintiff establishes a prima facie case for discrimination, the burden shifts to a defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *Id.* For a defendant to carry this burden, he must "clearly set forth" a nondiscriminatory reason. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). If the defendant meets this burden, the burden shifts to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext of discrimination." *Id.* at 253 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).

A.F. alleges he is an African American male with special needs and was discriminated against because of his race. Specifically, he claims that he was treated differently from R.G., a white student who is alleged to have committed similar acts but did not receive the same discipline. A.F. argues that this disparate treatment establishes a reasonable likelihood of success on the merits of both his Equal Protection and Title VI claims.

Disparate treatment is a necessary element of A.F.'s claims under both the Equal Protection Clause of the Fourteenth Amendment and Title VI. Despite having the opportunity to build a record on disparate treatment, A.F. failed to adduce credible evidence of disparate treatment. There is no question that there is substantial evidence—discussed at length above—that supported the School District's decision to discipline A.F. No evidence was presented at the evidentiary hearing to draw any inference that the School District's discipline of A.F. was racially motivated. Nor did A.F. establish that R.G. was similarly situated but treated differently. Unlike the clear record of A.F.'s communications, no threats by R.G. were recorded and presented as evidence. It is true that A.F. testified that R.G. told him "shut the F up, just come to practice" and that when A.F. told him, in turn, to shut up, R.G. is alleged to have said, "we can fight and I'll kill you." (ECF No. 25, p. 10). Even if true, this statement was not recorded on Snapchat and not brought to school authorities' attention at the time they began their investigation into A.F.'s clear threats and photograph of himself holding a gun. A.F.'s written statement to Principal Zupsic references alleged statements by R.G. that allude to the possibility of a fight. But this statement is not clear and is markedly different from the number of direct and implicit threats made by A.F. that were brought to the attention of school authorities. After A.F. was removed from the team, his father requested and received a follow-up meeting where he "attempted to play an audio recording" of R.G. The record is not clear that he was able to actually do so. A.F. did not bring or present any such recording at the evidentiary hearing before the Court.

The record, as currently developed, does not establish that the decision to discipline A.F. was motivated by his race. Rather, the School District had substantial grounds to impose discipline based on the record of A.F.'s own communications and in light of established school

policy regarding threats. A.F. has, likewise, failed to show, at this stage, that he was treated materially differently from R.G. or any other student. Unlike R.G., there is a clear record of A.F.'s statements as well as the photo with the bb gun—all of which were brought to the attention of school authorities and all of which were before them when they made their decision. The Court has not been presented with any evidence that school authorities were presented with similar concerns about R.G. or that they had any, much less similar, evidence of R.G.'s conduct.[3]

The record does not permit the Court, at this stage, to find that there is competent evidence that A.F. is likely to succeed on the merits of his claims under Count IV. He has failed to adduce evidence either of racial motivation for his discipline or disparate treatment. He may, ultimately, be able to further develop the record on these points in the course of discovery, but the record, as it stands, precludes the entry of preliminary injunctive relief.

### IV. CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As explained above, the Court concludes that A.F. has failed to establish a "gateway factor" on his claim for preliminary injunctive relief—that he is reasonably likely to succeed on the merits of his First Amendment claims or claims relating to racial discrimination. Because A.F. has failed to establish this first prong, the

---

[3] The record shows that Principal Zupsic reached out to R.G.'s mother to attempt to investigate R.G.'s role in the incident. After R.G.'s mother declined to tender him for a statement, Principal Zupsic does not appear to have done anything to follow up. This level of diligence in conducting the investigation may or may not, ultimately, have been reasonable, but the Court does not find that it evidences any discriminatory intent or disparate treatment. The fact remains that A.F.'s conduct was clearly evident by his own written and photographic posts on Snapchat, that these communications were brought to school authorities' attention by coaches and that they independently give rise to a reasonable basis for discipline under the School District's policies. In light of the record, as a whole, as well as the Court's assessment of the school witnesses' credibility, the Court does not believe that the failure to undertake a deep investigation into R.G.'s statements supports a finding that the School District violated the Fourteenth Amendment or Title VI.

Court need not explore the other prerequisites for preliminary injunctive relief. A.F.'s motion will be denied by Order of Court to follow. (ECF No. 3).

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

__8/27/2021__
Dated